# AFFIDAVIT IN SUPPORT
# OF
# APPLICATIONS FOR SEARCH WARRANTS

I, Galen Doud, being first duly sworn, state under oath as follows:

<u>Preface</u>

1. This affidavit is furnished to support an application for warrants to search the following electronic equipment seized from Brian PEREZ, DOB        1990, after his arrest on May 19, 2021 (collectively, the "Target Devices"):

    a. A silver iPhone.

    b. A silver iPhone with a black case with a FOH (Furniture Orders On Haste) decal.

    c. A silver iPad bearing serial number DLXXX0YGK825 with a black case with a FOH (Furniture Orders On Haste) decal.

The Target Devices are in the possession of law enforcement, as described in Attachment A. There is probable cause to believe the Target Devices contain evidence and instrumentalities of the Target Offense, as described in Attachment B.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause to believe that evidence of the Target Offense, described more fully in Attachment B, exists in the Target Devices, described in Attachment A.

<u>Introduction</u>

3. I have been a Special Agent with the Drug Enforcement Administration ("DEA") since May 2017, and I am currently assigned to DEA's Manchester District Office. I am authorized to investigate violations of the laws of the United States, including violations of

federal narcotics laws in Title 21 of the United States Code.  While attending the DEA Training Academy, I received training on a multitude of topics pertaining to drug investigations.  My primary duties as a DEA Special Agent include investigating federal crimes and violations of the Controlled Substances Act at the local, national, and international level.  I have been involved in numerous drug investigations, including wiretap investigations, where I have analyzed telephone toll records and subscriber information.  I have also participated in both physical and electronic surveillances, including monitoring cell phone "pings," the purchase of illegal drugs, enforcement operations including the execution of both search and arrest warrants, and interviews of sources of information, confidential sources, drug traffickers, and other members of drug trafficking organizations.

    4.    Prior to being employed as a DEA Special Agent, I was employed as a full time police officer with the City of Nashua, New Hampshire Police Department for approximately four and one-half years.  I made several hundred arrests and initiated, conducted, and assisted in even more criminal investigations, many of which involved drug violations.  I worked as a police officer in a uniformed and plain clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking organizations.  I have also attended multiple trainings about drug related investigations, and relevant topics associated with drug investigations.  I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

    5.    Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such

activities to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. I have observed and examined methamphetamine, cocaine, cocaine base ("crack"), heroin, fentanyl, and marijuana as well as other controlled substances. I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade. I also am familiar with the manner in which drug traffickers use telephones and other electronic devices, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

## Probable Cause

6.  On May 11, 2021, New Hampshire State Police Trooper Charles Newton informed me of a suspicious package sent via UPS. I went to the UPS facility in Nashua, New Hampshire where Trooper Timothy Berky had met with UPS personnel and advised that his drug detecting canine partner Granite alerted to the presence of controlled substances within a package. This package contained a printed UPS label with sender information:

> Ramsis EZAUT
> The UPS Store #2907
>
> Studio City, CA 91604-3155
>
> And handwritten sender information:
>
>
> Los Angeles, CA 90068
> Ramses EZAUT
>
>
> With recipient information:
>
> Salem NH 03079 Bryan KAMBEL

3

UPS decided to administratively open this package. Upon opening this package, investigators discovered a toaster oven box containing approximately 2137.85 grams of suspected methamphetamine (including packaging), which field tested positive for the presence of methamphetamine via a TruNarc device. Additional UPS shipping records revealed that since April 10, 2021 this was the ninth package sent from the greater Los Angeles, California area sent to　　　　　　　Salem, New Hampshire. Notably,　　　　　　　is a multi-unit apartment building. None of the nine packages identified a specific apartment number, and instead specified only

7. On May 18, 2021, investigators discovered that another package had been mailed on May 17, 2021 from California to　　　　　　　Salem, New Hampshire. The package was delivered before agents could intercept or examine the package.

8. On May 19, 2021, investigators intercepted another suspicious UPS package destined for　　　　　　　This package was sent from:

Rober THOMPSON

Burbank, CA 91501

And addressed to:

Cristina CARSON
　　　　　　　Salem NH03079

Trooper Berky utilized Canine Granite to conduct a sniff of the exterior of the package which was placed in a "line up" of five packages. Trooper Berky determined that Canine Granite alerted to the presence of controlled substances within the target package. Trooper Berky applied for and was subsequently granted a state of New Hampshire search warrant for the package. Agents opened the package and discovered approximately 2227.50 grams of suspected

methamphetamine (with packaging), which field tested positive for the presence of methamphetamine via a TruNarc device.

9. After the suspected methamphetamine was seized by investigators, the package was repackaged with "sham," an innocuous filler. Then, a law enforcement officer, acting in an undercover capacity, delivered the package to the front foyer/mailbox area of            Additional investigators conducted surveillance inside and around            At approximately 4:10 p.m., Trooper Matthew Locke observed a vehicle later identified as a 2019 white Dodge Ram Pro 150 arrive and park on the walkway outside the front of            Trooper Locke observed a male, later identified by his New Hampshire driver's license as Brian PEREZ, enter the foyer and examine the package. Trooper Locke observed PEREZ leave the foyer, make a call on a cell phone, and then reenter the foyer at approximately 4:13 p.m. Trooper Locke observed PEREZ manipulate the package while PEREZ continued his phone conversation. Approximately one minute later, Trooper Locke observed PEREZ leave the foyer and walk towards the Ram. Trooper Locke then confirmed that the package was no longer in the foyer.

10. Meanwhile, other investigators observed the Ram back out and off the walkway and proceed east on Oak Ridge Avenue before it pulled into the parking lot of            Street. Law enforcement officers and investigators approached the Ram as it began to back into a parking space. As I approached from behind with my emergency lights activated and other agents came alongside the Ram, it suddenly and quickly accelerated a short distance through the parking lot. It stopped just prior to a grassy area on the north side of the parking lot.

11. Investigators detained PEREZ and his front and sole passenger, later identified as Xavier RIVERA. Upon approaching PEREZ and removing him from the driver's seat of the Ram, PEREZ spontaneously stated something to the effect of, "He just told me to grab it for him." PEREZ had two cell phones in his possession. During a safety sweep of the Ram,

investigators observed in plain view the above described "sham" package in the rear of the Ram near other packages containing unknown contents. PEREZ and RIVERA were transported to the Salem Police Department while the Ram was seized and towed to the Salem Police Department pending the application of a search warrant.

12. RIVERA was escorted to an interview room at the Salem Police Department. RIVERA was informed he was detained and was the subject of a federal drug investigation to which he acknowledged. RIVERA said he can read and write English, and attended one semester of college. He acknowledged that investigators had read his Miranda warnings and that he did not have any questions, did not want his rights read to him again, and did not want the interview recorded.

13. RIVERA said he knew the driver of the Ram as his brother's friend "Muffin." RIVERA said he has known Muffin since 2011 but did not know his real name, and later said Muffin's last name was PEREZ. RIVERA said he started working for PEREZ in March 2021, and said sometimes he gets paid for working for PEREZ, and other times he does not. RIVERA said he met PEREZ earlier on this date at the FOH Furniture company between approximately 11:30 a.m. and noon, which RIVERA said was located at Centennial Place in South Lawrence, Massachusetts. An open source query via the search engine Google revealed One Centennial Place to be located at or within ⬛⬛⬛⬛⬛ awrence, Massachusetts. RIVERA said he did not know why PEREZ drove up the walkway at ⬛⬛⬛⬛⬛ and said he had been to ⬛⬛⬛⬛⬛ before to visit PEREZ's family, in an apartment possibly on the first floor. RIVERA said PEREZ has two phones, one personal phone and one for PEREZ's furniture business, and added PEREZ just got both phones last week. RIVERA said PEREZ's phone

number stayed the same despite RIVERA recently getting new phones and added PEREZ's personal phone was in RIVERA's phone as "Muff."

14. RIVERA said upon arrival at ⬛, PEREZ went inside and looked like he was checking something. RIVERA said upon leaving, PEREZ said he wanted to go see his daughter at his parents' apartment within ⬛ RIVERA said he knew PEREZ grabbed a package when PEREZ picked it up and put it in the Ram. RIVERA described PEREZ's two cell phones as one gray and one black, neither with cases. RIVERA said the only property he had in the Ram was his cell phone, keys, and work gloves. RIVERA reviewed and then voluntarily signed a written DEA consent to search form for his property including his cell phone. RIVERA was then released from detention.

15. Meanwhile, Trooper Berky applied for and was subsequently granted a state of New Hampshire search warrant for the Ram. A search of the Ram revealed, among other items, the above described sham package, two other packages containing furniture, and a backpack between the two front seats containing an undetermined amount of United States currency, an iPad, and a prescription pill bottle in PEREZ's name. A review of RIVERA's cell phone included photographs of two flights to Los Angeles in March 2021, the same month which RIVERA said he began working for PEREZ. A review of RIVERA's phone revealed a phone contact "Muff," ⬛6567. It should be noted PEREZ initially identified his phone number to investigators as ⬛6567, and then later identified his phone number as ⬛1771. PEREZ also identified ⬛1771 as the same phone number for his furniture business, Furniture Orders On Haste (FOH), and provided an address for FOH Furniture of ⬛ Street, Apartment 7, Salem, New Hampshire.

16. A United States Postal Service (USPS) receipt was recovered from PEREZ's person. The receipt was for a USPS parcel mailed from the post office located at 272 Broadway, Methuen, Massachusetts, at approximately 4:00 p.m., a short time before law enforcement made contact with PEREZ. This parcel was destined for Miami Beach, Florida, weighed 9 pounds and 11.2 ounces, had tracking number 892, cost $33.90, and was paid with cash. Based on the totality of the investigation, I notified United States Postal Inspection Service Inspector Sean Doyle about this parcel. This parcel was subsequently located the following day, May 20, 2021, in Nashua, New Hampshire, and was transferred to Manchester, New Hampshire. The handwritten sender information read:

From: Marks Discount

01843 Lawrence Ma.

And the handwritten recipient information read:

Kevin Johnson

Miami Beach, FL 33139

An open source query via the search engine Google revealed is the address for "Boulevard Hotel." Additionally, a Google query of "Marks Discount" did not associate with 49 Blanchard Street, nor anywhere else in Lawrence, Massachusetts. Also on May 20, 2021, Trooper Berky utilized Canine Granite to conduct a sniff of the exterior of this parcel which was placed in a line of five parcels. Trooper Berky advised that Canine Granite alerted to the presence of controlled substances within the target parcel.

17. On May 21, 2021, USPIS Task Force Officer (TFO) Steven Hallam applied for and

was subsequently granted a federal search warrant for this parcel.  On May 24, 2021, the search warrant was executed on this package, which was found to contain, among other items, a clear, plastic bag containing orange, circular pills imprinted 30 on one side, and AD on the other side.  These pills were seized by law enforcement, and with packaging, weighed approximately 392.75 grams.  These pills were field tested via a TruNarc device and tested positive for the presence of methamphetamine and caffeine.

<u>Probable Cause to Believe the Target Devices Contain Evidence and Instrumentalities of the Target Offense</u>

18.     Based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking.  These tasks are frequently accomplished through text messages, encrypted messages, and photographs.  Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity.  For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers).  Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

19. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones and other electronics to include iPads (which are included in Attachment B's definition of computer "hardware") can now function essentially as small computers. The Target Devices consist of smartphones and an iPad. Smartphones and iPads have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

20. Based on my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

21. Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is

      overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media, in particular computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

Conclusion

22.    Based upon my training and experience, and the forgoing information, there is probable cause to believe that PEREZ has committed violations of the Target Offense, and that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Equipment described in Attachment A.

/s/ Galen Doud
Special Agent Galen Doud, DEA

The Affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Andrea K. Johnstone
United States Magistrate Judge

Date: June 10, 2021

Time: 5:16 PM, June 10, 2021

<u>Attachment A- Equipment to be Searched</u>

The Equipment to be searched consists of the following electronic equipment seized from PEREZ following his arrest on May 19, 2021 (collectively, the "Target Devices"):

a.  A silver iPhone.

b.  A silver iPhone with a black case with a FOH (Furniture Orders On Haste) decal.

c.  A silver iPad bearing serial number DLXXX0YGK825 with a black case with a FOH (Furniture Orders On Haste) decal.

The Equipment is located at the DEA's Manchester District Office.

Attachment B- Items to be Seized

1. All records, in whatever form, and tangible objects that constitute evidence, or instrumentalities of 21 U.S.C. § 841(a)(1) (attempted possession with intent to distribute controlled substances) (the "Target Offense") from January 1, 2019 to the present, including those related to:

   a) records of drug trafficking activities;

   b) lists of customers and related identifying information;

   c) any information recording schedule, whereabouts, or travel, including calendar, e-mails, cell tower, and GPS data;

   d) all bank records, checks, credit card bills, account information, and other financial records;

   e) the identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

2. Evidence of user attribution showing who used or owned the Equipment at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

**Definitions**

For the purpose of this warrant:

A. "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any

connections), and any security device, (such as electronic data security hardware and physical locks and keys).

B. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

C. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

D. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

E. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or instrumentalities of crime.